# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JESSICA NICOLE FRASE, | ) | CASE NO. 5:22-CV-01699-BYP |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| v. | ) | BENITA Y. PEARSON |
| | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY ADMINISTRATION, | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.    INTRODUCTION

Plaintiff Jessica Nicole Frase ("Ms. Frase") seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1). U.S. District Judge Benita Y. Pearson has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court AFFIRM the final decision of the Commissioner.

## II.    PROCEDURAL HISTORY

Ms. Frase filed an application for DIB on March 4, 2020, and an application for SSI on May 21, 2020. (Tr. 20, 192).[1] Both applications alleged a disability onset date of February 17, 2020. (Tr. 20, 192). These applications were denied initially and upon reconsideration. (Tr. 100-09, 116-23). Ms. Frase requested a hearing before an administrative law judge ("ALJ"). (Tr. 123-

---

[1] The administrative transcript ("Tr.") is located at ECF Doc. 4 on CM/ECF.

24). On July 26, 2021, an ALJ held a telephonic hearing due to the COVID-19 pandemic during which Ms. Frase, represented by counsel, and a vocational expert ("VE") testified. (Tr. 38-63). On August 5, 2021, the ALJ issued a written decision finding Ms. Frase not disabled. (Tr. 20-29). The ALJ's decision became final on July 26, 2022, when the Appeals Council declined further review. (Tr. 1-6). Ms. Frase filed a Complaint on September 22, 2022, challenging the Commissioner's final decision. (ECF Doc. 1). She raises the following assignments of error:

(1) The ALJ erred when he failed to find that the opinion of the treating physician was consistent with and supported by the medical evidence and failed to incorporate the stated limitations into the RFC.

(2) The ALJ committed harmful error when he failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence and limiting effects of Frase's symptoms precluded her from engaging in substantial gainful activity on a full-time and sustained basis.

(ECF Doc. 6, PageID#541).

### III.    BACKGROUND INFORMATION

#### A.  Personal, Educational, and Vocational Experience

Ms. Frase was born in 1993, and she was 26 years old on the alleged disability onset date. (Tr. 27). She lives with her husband and two sons. (Tr. 44). She has an associate degree. (Tr. 45). Her past work was as a medical coder or a medical biller. (*See* Tr. 47).

#### B.  Relevant Hearing Testimony

##### 1.  *Ms. Frase's Testimony*

Ms. Frase testified that she was unable to work full-time because she is unable to stay on task due to her anxiety, depression, PTSD, emotional and visual flashbacks, and dissociation. (Tr. 47). These mental conditions would leave her feeling numb and without "executive function during that time." (Tr. 47-48). She stated that she experiences panic attacks twice a month when she stays at home and is not around people, but she had panic attacks at least once a week while working

2

full-time. (Tr. 48). These panic attacks would last for a few minutes, followed by a period of dissociation lasting from 30 minutes to a day. (Tr. 48-49). She testified that her panic attacks are triggered from past childhood experiences. (Tr. 49). Actions such as someone yelling at her or correcting her in a stern manner will trigger her panic attacks, but these panic attacks may also be "set…off" by a random emotional flashback. (*Id.*).

To help with her anxiety and panic, Ms. Frase engages in talk therapy and takes Cymbalta, Buspar, and Remeron. (Tr. 49-50). She testified that taking the medications helped. (*See* Tr. 50). Specifically, she testified that while on Cymbalta, she has noted "a definite change" since that last medication she was prescribed. (*Id.*). Her Buspar helps her to relax, but she testified that she notices that sometimes the dosage needs to be adjusted because she experiences days where she is "kind of zonked out a little bit, that [she is] a little bit too relaxed." (Tr. 50). She testified that she is able to manage taking medication on her own, but her husband also makes sure that she does so. . (*Id.*).

Ms. Frase testified that she notices her social anxiety the most when she goes to public places such as grocery stores. (Tr. 51). She stated that she typically does not experience issues while at the grocery store until she is at the checkout line and register, and when she is "standing still." (*Id.*). She also testified that meeting new friends or family is usually hard for her. (*Id.*). She prefers to "stay to herself." (*Id.*). Ms. Frase has two friends that she sees at least once every four months. (Tr. 52). She does not interact with her neighbors. (*Id.*).

Due to her PTSD, Ms. Frase experiences nightmares. (*Id.*). When asked how often she experiences nightmares stemming from her PTSD, Ms. Frase testified that some days are better than others. (*Id.*). At the time of the hearing, she testified that she experiences nightmares once or twice a week. (Tr. 53).

3

Ms. Frase also testified that, on a typical night, she gets approximately four to six hours of sleep. (*Id.*). She does not find this enough and usually takes a nap around 1:00 pm. (*Id.*). She further testified that her depression comes with crying spells. (*Id.*). With medication, Ms. Frase is able to control this issue buy experiences uncontrollable crying approximately once a month. (*Id.*). She also testified that she experiences mood swings involving rage, but she has worked hard on controlling it. (*Id.*).

With respect to her depression, Ms. Frase testified that it results in low energy that prevents her from getting up in the morning and staying on task, as well as mood swings. (Tr. 54). Ms. Frase's counsel asked her to provide instances where she finds it hard to remain on task. (*Id.*). Ms. Frase testified that while working and reading, she would keep rereading the same paragraph of procedural code when she was depressed or anxious because she would not "understand[] what [it] is." (*Id.*). Ms. Frase further testified that she does not have a similar experience while at home. (*Id.*). She stated that it was not as stressful because she is "not having that constant 40-hour-a-week." (Tr. 54-55). She has completed projects at home, but she testified that it takes her "some time" and her husband has to "kind of get on [her back]" to complete the projects. (Tr. 55). However, she testified that she is able to handle work at home "a little bit easier." (*Id.*).

Ms. Frase testified that she told her doctor at least once that she ignored her mental health when she was working. (*See* Tr. 55). Specifically, Ms. Frase explained that whenever she was working, she would get "so caught up" and felt that her schedule was so compounded that she would not take her medication or forget if she took her medication. (*Id.*). While working, she testified that she would miss appointments or cancel appointments because she was just too tired. (*Id.*). She stated that pushing off those appointments hurt her mental health. (*Id.*). Regarding her

appetite, Ms. Frase testified that she typically does not eat more than one meal per day. (Tr. 56). Due to stress and anxiety, she testified that she does not usually feel hunger. (*Id.*).

### 2. *Vocational Expert's Testimony*

The VE described Ms. Frase's past relevant work as a medical coder. (Tr. 59). As a first hypothetical, the ALJ asked whether an individual with Ms. Frase's age, education, and job history that could perform a wide variety of both simple and complex tasks, but would not be able to perform tasks which required a high production rate pace; could interact on an occasional basis with supervisors and a small group of familiar co-workers with no more than incidental interaction with the general public; and should be limited to superficial contact, no group, tandem, or collaborative tasks, and no management direction or persuasion of others; and could respond appropriately to occasional change in a routine and relatively predictable work setting. (Tr. 59). The VE opined that the individual would not be able to perform Ms. Frase's past relevant work, but could perform other jobs such as a housekeeper, retail marker, and general office helper. (Tr. 60).

As a second hypothetical, the ALJ asked whether the individual from the first hypothetical, but otherwise reduced to no interaction with either co-workers or the general public, would be able to perform any jobs. (*Id.*). The VE opined that no jobs would exist. (*Id.*).

The next hypothetical the ALJ asked is whether the individual from the first hypothetical that was limited to medium exertional level would be able to perform any jobs. (*Id.*). The VE opined that this individual could still perform work as a housekeeper, retail marker, and general office helper. (*Id.*). If reduced to light exertional level for any given physical impairments, the VE opined that there still would be jobs available in the national economy. (Tr. 61).

The VE testified that being off task 15 percent of the time or more would be work-preclusive. (Tr. 61). She testified that employers generally allow one absence per month, which includes coming in late and leaving early. (*Id.*).

### C.  Relevant Non-Medical/Medical Opinion Evidence

#### 1.  *State Agency Opinions (Aracelis Rivera, Psy.D. and Vicki Warren, Ph.D.)*

At the initial level of consideration, Dr. Rivera found that Ms. Frase had no limitations in her abilities to understand, remember, or apply information and to concentrate, persist, or maintain pace, but moderate limitations in her ability to interact with others and to adapt or manage oneself. (Tr. 76). With respect to Ms. Frase's social interaction limitation, Dr. Rivera opined that Ms. Frase was markedly limited in her ability to interact appropriately with the general public, and moderately limited in her abilities to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. 77). Dr. Rivera observed that Ms. Frase is "able to relate to others in the work setting but can occasionally deal with the public." (Tr. 77).

Regarding Ms. Frase's adaptation limitation, Dr. Rivera opined that Ms. Frase was moderately limited in her ability to respond appropriately to changes in the work setting but not significantly limited in her abilities to respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. (Tr. 77-78). At the reconsideration level, Dr. Warren agreed with Dr. Rivera's findings. (Tr. 88-89).

#### 2.  *John Vraciu, DO*

Dr. Vraciu completed a Mental Impairment Questionnaire for Ms. Frase on July 8, 2021. (Tr. 515-16). He indicated that Ms. Frase had been seeing him every four to six months since September 3, 2020. (Tr. 515). Dr. Vraciu listed Ms. Frase's diagnoses as recurrent major depressive disorder, generalized anxiety disorder, social anxiety, PTSD, and insomnia. (*Id.*). He indicated that Ms. Frase has been prescribed Cymbalta[2] and Terazosin. (*Id.*). The side effects of these medications are "sweats." (*Id.*). Dr. Vraciu reported that the prognosis of Ms. Frase's impairments was fair. (*Id.*). He opined that Ms. Frase's impairments lasted or are expected to last at least twelve months. (*Id.*).

Dr. Vraciu checked a series of boxes rating Ms. Frase's ability to do work-related activities on a day-to-day basis in a work setting. (*See* Tr. 515-16). He opined that Ms. Frase was "unable to meet competitive standards"[3] in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; interact appropriately with the general public; and accept instructions and respond appropriately to criticism from supervisors. (*Id.*). Dr. Vraciu further opined that Ms. Frase was "seriously limited, but not precluded"[4] in her ability to sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; ask simple questions or request assistance; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. (*Id.*). Dr. Vraciu also opined that Ms. Frase was "unlimited or very good" in her ability to carry out very short and simple instructions. (Tr. 515). Dr. Vraciu opined that Ms. Frase was "limited but

---

[2] Cymbalta is the US brand name for Duloxetine, a drug used to treat depression and anxiety. *See* Mayo Clinic, Duloxetine (Oral Route), https://www.mayoclinic.org/drugs-supplements/duloxetine-oral-route/description/drg-20067247 (last visited July 14, 2023).

[3] The Mental Impairment Questionnaire defined "unable to meet competitive standards" as the patient "cannot satisfactorily perform this activity independently, appropriately, effectively and on a sustained basis in a regular work setting." (Tr. 515).

[4] "Seriously limited, but not precluded" is defined by the Mental Impairment Questionnaire as the patient's ability to function in the specific area "is less than satisfactory, but not precluded in all circumstances." (Tr. 515). This individual would be limited in their ability to perform activity 15 percent of the time. (*Id.*).

satisfactory" in several abilities, including but not limited to, her ability to maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, perform at a consistent without an unreasonable number and length of rest periods, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and be aware of normal hazards and take appropriate precautions. (*See generally* Tr. 515-16).

Dr. Vraciu additionally opined that Ms. Frase's impairments would cause her to be absent from work one to two times per month. (Tr. 516). He finally opined that Ms. Frase would be off task approximately 15 percent per day. (*Id.*). When asked to describe the clinical findings that demonstrate the severity of Ms. Frase's mental impairments and symptoms, Dr. Vraciu merely wrote, "We diagnose by DSM-5 and patient's subjective reports." (Tr. 515).

### D. Relevant Medical Evidence

On January 2, 2020 (a month before her alleged disability onset date), Ms. Frase self-referred herself to establish care with Ms. Teri Lieser, APRN. (Tr. 261). Ms. Frase reported that she was experiencing panic attacks, claustrophobia, obsessive thoughts, and compulsive rituals. (*Id.*). She had been seeing a counselor and reported that her therapist "thought it may be helpful to consider medication also." (*Id.*). Ms. Lieser diagnosed Ms. Frase with depression, anxiety, and possible PTSD. (*Id.*). Ms. Lieser prescribed Ms. Frase Zoloft. (*Id.*).

On February 12, 2020, Ms. Frase appeared at the emergency room, reporting a history of PTSD and anxiety after "the person who the PTSD is related to" contacted her. (Tr. 306). Ms. Frase was prescribed Xanax. (Tr. 308). She returned to the emergency room on February 18, 2020, reporting an exacerbation of her anxiety of depression. (Tr. 312). She stated that she did not "feel in control" or like [herself]." (*Id.*). Her diagnosis was depression and anxiety. (Tr. 314). Ms. Frase was discharged in stabled condition and given a referral for an intense outpatient program. (*Id.*).

On February 20, 2020, Ms. Frase returned to Ms. Lieser. (Tr. 270). She had a depressed and anxious mood and was prescribed Busprione and hydroxyzine (anti-anxiety medications). (Tr. 271). On March 4, 2020, Ms. Frase reported that her sleep and appetite were slightly better, and she was considering looking for another job. (Tr. 265). On March 31, 2020, Ms. Frase reported that her sleep and appetite were "OK," and that she had quit her job. (Tr. 263).

In September 2020, Ms. Frase established care with Dr. John Vraciu, D.O. to receive further psychiatric treatment. (Tr. 415). She reported that she had previously worked in billing and coding for two years, but "had a mental breakdown in February 2020." (Tr. 415). She reported a history of anxiety and depression since she was five years old, and PTSD from trauma when she was five to fifteen years old. (Tr. 415-16). Her mental status examination revealed that she looked down a lot, had quiet speech, and was anxious, but she was cooperative, had normal attention span and concentration, and fair insight and judgment. (Tr. 418). Dr. Vraciu started Ms. Frase on Cymbalta for PTSD, anxiety, and depression and Remeron for sleep. (Tr. 422).

On October 19, 2020, Ms. Frase had a telephone visit with Dr. Vraciu. (Tr. 420). She reported that she was "doing pretty good." (Tr. 420). She noticed some improvements with her mood. (*Id.*). She stated that her depression was starting to "feel a little better"; her anxiety was feeling "at least 20% better"; and she was "working on" her PTSD (*Id.*). Her mental status examination revealed that Ms. Frase had euthymic affect, "a little better" mood, normal attention span and concentration, and fair insight and judgment. (Tr. 421). Dr. Vraciu continued Ms. Frase on her medications. (Tr. 422).

On December 17, 2020, Ms. Frase followed up with Dr. Vraciu. (Tr. 573). She reported that she had been "doing okay." (Tr. 473). Her sons were still attending school at home and although they "are pretty self-sufficient … she has to double check them and it's more stressful

9

than a normal school year." (*Id.*). She reported her moods were "overall…better"; her depression "has been doing pretty good and really manageable"; and her anxiety was "better controlled, but still flares up in situations." (*Id.*). She reported only having two to three panic attacks "in the past few months." (*Id.*). She told Dr. Vraciu that her social anxiety "ha[d] been pretty good [,] but she felt anxious in stores." (*Id.*). Dr. Vraciu continued Ms. Frase's medications. (Tr. 475).

On July 8, 2021, Ms. Frase reported "doing okay." (Tr. 517). She stopped taking Cymbalta a week earlier because she "missed an appointment" and had "not com[e] in for over [six] months." (*Id.*). She also "self-taper[ed]" her anxiety medication, Buspar. (*Id.*). She was looking for jobs and was "hoping that she could do something." (*Id.*). She reported that she thought she would do better working from home. (*Id.*). She stated that she has anxiety around working because she felt that when she worked in the past, she ignored her mental health. (*Id.*). She told Dr. Vraciu that she feels she can cope better with life without the stress of work. (*Id.*). She was thinking about trying part-time because she remembered "feeling paralyzed" working 40 hours per week. (*Id.*). Ms. Frase reported that her depression since her last visit had not "been too bad," except that she was out of medication and "fe[lt] it a bit more." (*Id.*). She stated her anxiety had been "coming up a bit heightened lately and a lot of it is social anxiety." (*Id.*). She experienced a few panic episodes. (*Id.*). She stated that she noticed that she was not experiencing as many triggers with her PTSD. (Tr. 518). Her mental status examinations revealed anxious affect, "okay, a bit nervous" mood, normal attention span and concentration, and fair insight and judgment. (Tr. 518).

Ms. Frase continued to seek counseling and saw a therapist four times from August 2020 until May 2021. (Tr. 503-14). These counseling notes contained similar statements. (Tr. 503, 506, 509, 512). Specifically, her diagnoses were major depressive disorder, PTSD, generalized anxiety disorder, personal history of sexual abuse, parent-child relational problem, sibling relational

problem, and child affected by parental relationship distress. (*Id.*). These notes also all stated that she met criteria for major depression disorder as evidenced by her self-reported symptoms of having little pleasure in her life, feeling down all the time, having trouble falling asleep, feeling tired all the time, having poor appetite, feeling bad about herself, and feeling like she is moving slowly all the time. (*Id.*). Her self-reported symptoms for anxiety were feeling nervous all the time, not being able to control the worry, worrying about may different things, having trouble relaxing, being easily irritated, and feeling anxious that something awful was going to happen. (*Id.*). The notes stated that "[t]hese symptoms interfere with functioning in all areas of her life." (*Id.*).

## IV.    THE ALJ'S DECISION

In his August 2021 decision, the ALJ first found that Ms. Frase met the insured status requirements of the Social Security Act through December 31, 2020. (Tr. 22). The ALJ then found Ms. Frase has not engaged in substantial gainful activity since February 17, 2020, the alleged disability onset date. (*Id.*). The ALJ further determined that Ms. Frase has the following severe impairments: depressive disorder, generalized anxiety disorder/social anxiety disorder, and posttraumatic stress disorder. (Tr. 23). However, the ALJ found that none of these impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*).

The ALJ also determined that Ms. Frase could perform a full range of work at all exertional levels with the following nonexertional limitations:

> can perform a wide variety of both simple and complex tasks, but cannot perform tasks which require a high production rate pace such as assembly line work; can interact on an occasional basis with supervisors and a small group of familiar coworkers, with no more than incidental interaction with the general public, and should be limited to superficial contact, meaning no sales, arbitration, negotiation, conflict resolution or confrontation, no group, tandem or collaborative tasks, and no management, direction or persuasion of others; and can respond appropriately to occasional changes in a routine and relatively predictable work setting

11

(Tr. 24).

The ALJ next determined that Ms. Frase is unable to perform any past relevant work. (Tr. 27). She also determined that the transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a "not disabled" finding regardless of whether Ms. Frase has transferable job skills. (*Id.*). However, the ALJ determined that, considering Ms. Frase's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Ms. Frase can perform. (Tr. 28). Accordingly, the ALJ determined that Ms. Frase was not disabled. (*Id.*).

## V.    LAW AND ANALYSIS

### A.    <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a

reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B. <u>Standard for Disability</u>

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the

national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id*.

    **C.**  **Analysis**

Ms. Frase raises two assignments of error: (1) that the ALJ erred by failing to find the opinion of the treating physician consistent with and supported by the medical evidence and to incorporate the stated limitations into the RFC; and (2) the ALJ erred in his SSR 16-3p analysis and failed to find that Ms. Frase's symptoms precluded her from engaging in substantial gainful activity on a full-time and sustained basis. (*See* ECF Doc. 6, PageID#541). I find that both assignments lack merit.

        **1.**  ***Substantial Evidence Supports the ALJ's Finding Regarding the Persuasiveness of Dr. Vraciu's Opinion on Ms. Frase's Mental Limitations.***

            **a.**  **The ALJ's Decision to Find Dr. Vraciu's Opinion Unpersuasive is Supported by Substantial Evidence.**

Ms. Frase asserts that the ALJ erred by finding Dr. Vraciu's opinion unpersuasive because the ALJ did not acknowledge contrary evidence regarding supportability and consistency. (*See* ECF Doc. 6, PageID#548-53). Ms. Frase argues that it is "unclear from the record" how the ALJ determined that she could engage in substantial gainful activity on a full-time and sustained basis. (*Id.* at PageID#549). This argument is not well-taken.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how [she] considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2).[5] According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

Dr. Vraciu completed a Mental Impairment Questionnaire for Ms. Frase. (Tr. 515-16). He noted that Ms. Frase had been visiting him every four to six months. (Tr. 515). He indicated that Ms. Frase had the following diagnoses: recurrent major depressive disorder, generalized anxiety disorder, social anxiety, posttraumatic stress disorder, and insomnia. (*Id.*). He noted that Ms. Frase took Cymbalta and Terazosin and that the side effects that these medications would have on working was "sweats." (*Id.*). Cr. Vraciu opined that Ms. Frase has an unlimited or limited satisfactory ability in several areas of functioning, but she was seriously limited but not precluded in sustaining an ordinary routine without special supervision, working in coordination with or in proximity to others without being distracted by them, asking simple questions or requesting

---

[5] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 404.1520c(c)(3)-(5).

assistance, responding appropriately to changes, and setting realistic goals. (Tr. 515-16). He further opined that Ms. Frase was "unable to meet competitive standards" in completing a normal workday or workweek without interruptions from psychologically based symptoms, interacting appropriately with the general public, and accepting instructions and responding appropriately to criticism from supervisors. (*Id.*). He opined that Ms. Frase would be absent from work one to two days per month and off task 15% per day. (Tr. 516). When asked to describe the clinic findings that demonstrate the severity of Ms. Frase's mental impairments and symptoms, Dr. Vraciu simply stated, "We diagnose by DSM-5 and patient's subjective reports." (Tr. 515).

In the instant case, the ALJ discussed Dr. Vraciu's July 2021 opinion and found it to be unpersuasive because Dr. Vraciu provided inadequate explanation or supporting evidence with this opinion, and it was inconsistent with other record evidence. (Tr. 26-27). The ALJ discussed the supportability and consistency of Dr. Vraciu's opinion when reaching his conclusion.

Significantly, the ALJ addressed the supportability factor. As stated above, the Social Security regulations define supportability as "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinions…the more persuasive the medical opinions will be." 20 C.F.R. § 404.1520c(c)(1). Here, the ALJ observed that Dr. Vraciu "provided little explanation or supporting evidence for [his opined] extreme limitations aside from listing the claimant's diagnoses and subjective allegations, which are not fully consistent with the record for the reasons listed above." (Tr. 27). Indeed, Dr. Vraciu offered little, if any, explanation or supporting evidence for his opinion. (*See generally* Tr. 515-516). Dr. Vraciu provided a checkbox form indicating his opinion regarding Ms. Frase's ability to do work-related activities on a day-to-day basis in a regular work setting. As discussed in detail above, Dr. Vraciu checked his ratings for Ms. Frase's limitations in her sustained

concentration and persistence; understanding and memory; social interaction; and adaptation. (*Id.*). When asked to describe clinical findings that demonstrate the severity of Ms. Frase's mental impairments and symptoms, he merely stated "We diagnose by DSM-5 and patient's subjective reports." (Tr. 515). No other explanation was provided in support of Dr. Vraciu's opined limitations, and none of the records Ms. Frase references in her merits brief are cited by Dr. Vraciu in support of his opinion. (Tr. 515-16; *see generally* ECF Doc. 6, PageID#548-52).

To the extent that Ms. Frase argues that Dr. Vraciu's statement that he has treated Ms. Frase since September 2020 for recurrent major depressive disorder, generalized anxiety disorder, social anxiety, PTSD, and insomnia demonstrates that Dr. Vraciu provided some sort of supporting explanation (*see* ECF Doc. 8, PageID#578), I disagree. It is unclear—and Ms. Frase fails to demonstrate (*see id.*)—how this statement constitutes an adequate explanation for the severe limitations opined by Dr. Vraciu.[6]

Next, the ALJ addressed the consistency factor. Consistency is defined as "[t]he more consistent a medical opinion(s)…is with the evidence from other medical and nonmedical sources in the claim…the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(2). Specifically, the ALJ determined that Dr. Vraciu's opinion was inconsistent with the medical record as a whole, including Ms. Frase's limited mental health treatment history since the alleged onset date, without evidence of psychiatric hospitalization in the record, and her "unremarkable" reported symptoms to providers such as Dr. Vriaciu, without evidence of hallucinations, delusions, obsessions, compulsions, cognitive disorder, current suicidal/homicidal ideation, or other serious issues. (Tr. 27). This conclusion

---

[6] Dr. Vraciu's statement appears to be more relevant to another factor that an ALJ may consider when evaluating the persuasiveness of a medical opinion, the length, frequency, purpose, extent, and nature of the source's relationship to the client. *See* 20 C.F.R. § 404.1521(c)(3)(v).

finds support in the record. For example, the ALJ noted that at Ms. Frase's October 2020 visit, she reported she is doing "pretty good," her sons were attending school from home, and she was "not worrying about applying for a job." (Tr. 25; *see* Tr. 470). She noticed some improvement in her moods, and the side effect from her medication was night sweats. (Tr. 470). Ms. Frase's mental status examination revealed that she was alert and oriented to all spheres, her mood was "a little better," euthymic affect, and lack of suicidal ideation, intent, or plan. (*Id.*).

At her December 2020 visit, Ms. Frase reported that she was "doing okay." (Tr. 473). She reported that her depression "has been doing pretty good and really manageable." (*Id.*). She reported that her anxiety was "better controlled, but still flares up in situations." (*Id.*). She recalled having approximately two to three random panic attacks in the past few months preceding this appointment. (*Id.*). She indicated that her social anxiety "has been pretty good," but she did feel anxious in stores and got overwhelmed with "a lot" of noises, people, and waiting in line. (*Id.*). Her mental status examination revealed fair insight and judgment, logical thought content, and denial of suicidal/homicidal ideations, delusions, and hallucinations. (Tr. 474).

 Earlier in the ALJ's decision, the ALJ also discussed Ms. Frase's July 2021 appointment where Ms. Frase reported that she was doing "okay" and was still unemployed. (Tr. 25; *see* Tr. 517). She reported that her anxiety had been coming up "a bit heightened lately and a lot of it is social anxiety"; her depression was not too bad recently except she felt it more in the past week because she ran out of her medication; and she was using medical marijuana. (Tr. 25; *see* 517). Ms. Frase's mental status examinations indicated that she was alert and oriented to all spheres, her insight and judgment were fair, her mood was "okay, a bit anxious," her behavior was cooperative, and she denied any suicidal ideation, intent, or plan. (Tr. 26; *see* Tr. 518). Dr. Vraciu diagnosed Ms. Frase with several conditions, such as major depressive disorder and social anxiety disorder,

and advised Ms. Frase to resume taking Cymbalta and to continue taking her other medications as prescribed. (Tr. 26; *see* Tr. 519).

The ALJ found Dr. Vraciu's opinion inconsistent as a result of these records. (Tr. 26). Absent a determination that the ALJ failed to apply correct legal standard or made findings of fact unsupported by substantial evidence in the record, the ALJ's conclusion regarding this opinion must be affirmed. Here, the ALJ presented evidence demonstrating that Dr. Vraciu's opinion was inconsistent because the treatment notes from Ms. Frase's limited treatment history demonstrate reports of unremarkable symptoms, with an absence of psychiatric hospitalization and without evidence of hallucinations, delusions, obsessions, compulsions, cognitive disorder, current suicidal/homicidal ideation, or other serious issues. (*See generally* Tr. 25-26). A "reasonable mind might accept as adequate" the evidence (as discussed above) to support the ALJ's finding the opinion unpersuasive; therefore, the ALJ's determination must be upheld because substantial evidence supports it. *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).

Finally, Ms. Frase argues that the ALJ inaccurately interpreted the state agency psychologists' findings that she had a marked limitation in her ability to deal with the public. (ECF Doc. 6, PageID#552). She contends that the ALJ should not have interpreted the marked limitation finding to mean that she could have incidental interaction with the public, which the ALJ further defined as no sales, arbitration, negotiation, conflict resolution, or confrontation. (*Id.* (citing Tr. 24)). Ms. Frase fails to cite any case law in support of this contention. (*see generally id.*), and the Commissioner's arguments regarding this issue are well-taken. In the instant case, Dr. Rivera and Dr. Warren (the state agency psychologists) opined that Ms. Rivera had a marked limitation in her ability to interact appropriately with the general public. (Tr. 70, 88). State agency psychologists

are instructed by agency policy that "severity ratings or nonspecific qualifying terms (e.g., moderate, moderately severe)…do not describe function and do not usefully convey the extent of capacity limitation." SSA POMS DI 24510.065, https://secure.ssa.gov/poms.nsf/lnx/0424510065. The state agency psychologists here thus translated this severity rating into Ms. Frase's "social interaction capacities," concluding that Ms. Frase "is able to relate to others in the work setting but can only *occasionally* deal with the public." (Tr. 89) (emphasis added).

It is well-established that an ALJ is not required to include every limitation included in persuasive prior administrative medical findings. *See* 20 C.F.R. § 404.1546(c); *Daniels v. Comm'r of Soc. Sec.*, No. 3:19-CV-02946, 2020 WL 6913490, at *10 (N.D. Ohio Nov. 24, 2020. Here, Ms. Frase fails to explain in her merits brief or her reply brief how an "occasional" limitation to interaction with the public is any more limiting than "incidental" interaction with the public. (*See generally* ECF Doc. 6, PageID#552-53; ECF Doc. 8). Accordingly, I recommend that the Court reject this assignment of error because it lacks merit.

### 2. *Substantial Evidence Supports the ALJ's Finding that Ms. Frase's Subjective Complaints were Inconsistent with the Record.*

Ms. Frase argues that the ALJ failed to properly apply the SSR 16-3p criteria and to find that the intensity, persistence, and limiting effects of Ms. Frase's symptoms precluded her from engaging in substantial gainful activity on a full-time and sustained basis. (ECF Doc. 6, PageID#553-58). Specifically, Ms. Frase asserts that her testimony and written statements provided evidence regarding the intensity, persistence, and limiting effect of her symptoms on her ability to function and complete her activities of daily living. (*See id.* at PageID#554-57). Thus, she contends that she satisfied SSR 16-3p's criteria and that the ALJ "failed to articulate any supportable rationale" for finding her statements and the evidence did not support that she would be precluded from all types of work. (*Id.* at PageID#557). The Commissioner contends that the

ALJ's SSR 16-3p analysis contains sufficient explanation that is supported by substantial evidence. (ECF Doc. 7, PageID#573-76).The Commissioner's argument is well-taken..

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). An ALJ is not required to accept a claimant's subjective symptom complaints, however, and may properly discount the claimant's testimony about a claimant's symptoms when it is inconsistent with objective medical and other evidence. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003); SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017) ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence."). In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate his symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and restrictions. SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Although the ALJ should consider the entire record, there is no requirement that the ALJ discuss every factor that was considered in reaching her conclusion or provide a factor-by-factor analysis. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009); *see also Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence."). However, "[i]n evaluating an individual's symptoms, it is not sufficient for [an ALJ] to make a single, conclusory statement that

'the individual's statements about his or her symptoms have been considered' or that 'the statement about the individual's symptoms are (or are not) supported or consistent.'" SSR 16-3p, 2016 WL 1119029, at *9. Rather, an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.*; *see also Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, [s]he must clearly state [her] reason for doing so."). On review, courts must "accord the ALJ's determination of credibility great weight and deference particularly since the ALJ as the opportunity, which [the courts] do not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) (citations omitted).

A review of the ALJ's decision reveals that the ALJ offered discernible, valid reasons for discounting Ms. Frase's subjective symptoms. For example, the ALJ discussed the effectiveness of treatment when discounting Ms. Frase's allegations. This is a proper factor to consider. 20 C.F.R. § 416.929(c)(3)(v) (ALJ may consider "[t]reatment, other than medication, you receive or have received for relief of your pain or other symptoms[.]"). Significantly, the ALJ observed that Ms. Frase reported seeing a positive response to her psychotropic medications and counseling, despite not consistently taking her medication. (Tr. 26; *see, e.g.*, Tr .470, 473).

Next, the ALJ also observed the inconsistent treatment that Ms. Frase obtained for her symptoms—another appropriate consideration under the Social Security regulations. *See* SSR 16-3p, 2017 WL 5180304, at *9 ("[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of an individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged

22

intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of the record."); *Wreede v. Comm'r of Soc. Sec.*, No. 3:18CV164, 2019 WL 1324024, at *20 (N.D. Ohio Mar. 25, 2019). The ALJ noted that the absence of documentation of ongoing treatment was "inconsistent" and that it "seriously undermine[d] allegations of disabling, or even severe, limitations of function, lasting twelve months in duration and despite treatment[.]" (Tr. 26). This conclusion finds support in the record. Indeed, Ms. Frase reported improvement on her psychotropic medications. (Tr. 466, 470, 473). Although instructed to follow up in twelve weeks in December 2020, Ms. Frase failed to follow up with her provider in July 2021 when she requested a refill of her medication and asked Dr. Vraciu to complete paperwork in support of her disability application. (Tr. 517).

The ALJ also observed that Ms. Frase's allegations were inconsistent with her own reports to her mental health providers. (*See* Tr. 26); 20 C.F.R. § 404.1529(c)(4) (An ALJ will consider "whether there are any inconsistencies in the evidence and the extent to which there any conflicts between [the claimant's] statements and the rest of the evidence[.]"). Indeed, the ALJ pointed to notes that Ms. Frase reported mostly mild to moderate level symptoms to her providers, without evidence of hallucinations, delusions, obsessions, compulsions, cognitive disorder, current suicidal/homicidal ideation, or other serious issues. (Tr. 26). Looking elsewhere in the decision, the ALJ cited evidence in support of this conclusion. For example, the ALJ observed that in October 2020, Ms. Frase told Dr. Vraciu that she was doing "pretty good," her sons were home from school, which was good for her, and she was not worried about applying for a job. (Tr. 25; *see* Tr. 420). Her mental status examination revealed Ms. Frase was alert and oriented to all spheres, her mood was a little better, she had euthymic affect, and she denied suicidal, ideation, intent, or plan. (Tr. 25; *see* Tr. 421). In December 2020, Ms. Frase told her provider she was "doing

okay"; her moods were "overall … better"; her depression "has been doing pretty good and really manageable"; and her anxiety was "better controlled but still flares up in situations." (Tr. 473). In July 2021, at her last appointment, Ms. Frase reported that her depression "hasn't been too bad except for being out of medicine the last week," although her anxiety "has been coming up a bit heightened and a lot of it is social anxiety." (Tr. 517). Ms. Frase's mental status examination revealed that shewas alert and oriented to all spheres, had fair insight and judgment, her mood was "okay, a bit anxious," cooperative behavior, and lack of suicidal ideation, intent, or plan. (Tr. 26; *see* Tr. 518). Ms. Frase does not demonstrate how this was an inappropriate consideration in the ALJ's SSR 16-3p analysis. *Riggs v. Berryhill*, No. 3:17-CV-00183-DW, 2018 WL 1410842, at *9 (W.D. Ky. Mar. 21, 2018) (citing *Winning v. Comm'r*, 661 F.Supp.2d 807, 822 (N.D. Ohio 2009) and *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525 (6th Cir. 1997)) ("When the ALJ finds contradictions among the medical reports, claimant's testimony and other evidence, the ALJ may properly discount the credibility of the claimant.") (quotation marks omitted).

Finally, the ALJ considered Ms. Frase's activities of daily living, which is another factor that an ALJ may consider in his SSR 16-3p analysis. (Tr. 26); 20 C.F.R. § 416.929(c)(i) (daily activities is a relevant factor to evaluating claimant's subjective symptoms); *Blacha v. Sec'y of Health and Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) ("[T]he ALJ did not give undue consideration to Temples' ability to perform day-to-day activities. Rather, the ALJ properly considered this ability as one factor in determining whether Temples' testimony was credible."). In particular, the ALJ noted that at a February 2021 internal medicine consultative examination, Ms. Frase reported to Dr. Herman that she completed housework, took care of her children, used the Internet, and cared for her pets. (Tr. 26; *see* Tr. 449). While these activities alone may not conclusively establish Ms.

Frase's ability to engage in full-time work, her daily activities are nonetheless a relevant factor the ALJ could analyze when assessing her residual functional capacity. *Dodson v. Comm'r of Soc. Sec.*, No. 5:18-CV-02263, 2019 WL 6841771, at *3 (N.D. Ohio Dec. 16, 2019) ("[W]hile merely citing to a claimant's daily activities cannot conclusively establish an ability to engage in full-time work, it is also true that a claimant's capacity to perform tasks in daily living is a legitimate factor to be considered in assessing the claimant's functional capacity."). All of the reasons provided by the ALJ are reasonable and sufficiently clear to create a logical bridge between the evidence and the finding that Ms. Frase's statements were not consistent with the record evidence.

Ms. Frase, in support of her challenge to the ALJ's SSR 16-3p analysis, argues that the "medical evidence … supported [her] statements regarding the intensity, persistence, and limiting effects of her symptoms." (ECF Doc. 6, PageID#555). She summarizes multiple medical records but fails to put forth any analysis tying these records to her subjective symptoms. (*See generally id.* at PageID#555-57). Her merits brief does not address or attack any of the specific reasons the ALJ articulated for discounting her allegations. (*See generally id.* at PageID#555-58). Rather, Ms. Frase merely puts forth evidence that would support her preferred conclusion. (*Id.*). Ms. Frase is "essentially asking this Court to reweigh the evidence and issue a *de novo* determination." *Vidot v. Colvin*, No. 1:14 CV 1343, 2015 WL 3824360, at *8 (N.D. Ohio June 18, 2015). This is an impermissible request. "Even if the evidence could also support another conclusion, the decision of the [ALJ] must stand if the evidence could reasonably support the conclusion." *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). The Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)). As demonstrated above, the ALJ complied with SSR 16-3p by articulating sufficient reasons for

discounting Ms. Frase's allegations and those reasons are supported by substantial evidence.

Accordingly, I recommend that the Court reject this assignment of error because it lacks merit.

## VI.     RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court OVERRULE Ms. Frase's assignments of error and AFFIRM the Commissioner's decision.

Dated: July 17, 2023

s/ *Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).

Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).